# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| DONNA HICKOK, derivatively on behalf of SOUTHWEST AIRLINES CO., | Case No. 3:24-cv-1611 |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| GARY C. KELLY, DAVID W. BIEGLER, J. VERONICA BIGGINS, DOUGLAS H. BROOKS, WILLIAM H. CUNNINGHAM, PH.D., JOHN G. DENISON, THOMAS W. GILLIGAN, PH.D., RYAN C. GREEN, DAVID P. HESS, ROBERT E. JORDAN, GRACE D. LIEBLEIN, NANCY B. LOEFFLER, JOHN T. MONTFORD, J.D., THOMAS M. NEALON, CHRISTOPHER P. REYNOLDS, RON RICKS, TAMMY ROMO, LINDA RUTHERFORD, MARK R. SHAW, MICHAEL G. VAN DE VEN, and ANDREW WATTERSON, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| SOUTHWEST AIRLINES CO., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Donna Hickok ("Plaintiff"), by and through her undersigned counsel, brings this action derivatively on behalf of nominal defendant Southwest Airlines Co. ("Southwest" or the "Company") against certain of its current and former directors and officers. The allegations below are made upon personal knowledge as to Plaintiff and her own acts and upon information and belief as to all other matters, based upon a review of: (a) information publicly disseminated by

Southwest, including its public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, and postings on its website; (b) news reports and other publicly available sources; and (c) court dockets, filings, and orders related to litigation involving Southwest pending in this and other courts. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.      This case concerns the conduct leading up to and costly fallout resulting from the well-publicized mass flight cancellations of December 2022 during what was unofficially called "Winter Storm Elliott." The cancellations were not caused by the storm alone but rather by Southwest's persistent and years-long failure to maintain and update its flight scheduling systems to withstand the logistical strain of severe weather events. In total, between approximately December 21, 2022 and January 2, 2023, Winter Storm Elliott wreaked havoc on Southwest's dated software infrastructure, causing the Company to cancel nearly *17,000 flights* across several states, stranding over *two million passengers* during the busiest travel period of the year. Notably, though Elliott was indeed a strong storm, Southwest's competitors fared significantly better in the same conditions.

2.      None of this was a surprise to Southwest's management, directors, pilots, staff, or customers, as Southwest had a long history of similar problems, including numerous similar incidents occurring between 2011 and 2022.

3.      On February 9, 2023, Southwest's Chief Operating Officer, Andrew Watterson (named as a Defendant herein), was hauled before the U.S. Senate Committee on Commerce,

2

Science, and Transportation to answer for what he contributed to.[1] In his testimony, Defendant Watterson admitted the Company "messed up" and "did not have enough winter operational resilience." Also at the Senate hearing, among others, was Captain Casey A. Murray, President of the Southwest Airlines Pilots Association ("SWAPA"). Capt. Murray and his organization had been vocal about these issues for nearly a decade and testified that they had been "sounding the alarm about SWA's inadequate crew scheduling technology and outdated operational processes for years" but that "those warnings were summarily ignored."

4.      Then, on December 18, 2023, the U.S. Department of Transportation ("DOT") announced a record $140 million civil penalty against Southwest for its "numerous violations of consumer protection laws" in connection with the December 2022 flight cancellations.[2] U.S. Transportation Secretary Pete Buttigieg said of the penalty: "Taking care of passengers is not just the right thing to do—it's required, and this penalty should put all airlines on notice to take every step possible to ensure that a meltdown like this never happens again."

5.      Damage to the Company has been significant. It has been forced to pay a record DOT penalty, and Southwest and several of the Individual Defendants named herein (Robert E. Jordan, Gary C. Kelly, Thomas M. Nealon, Tammy Romo, Michael G. Van de Ven, and Andrew Watterson) are also currently subject to a consolidated securities class action lawsuit, pending in this Court, captioned *Teroganesian, et al. v. Southwest Airlines Co. et al.* (Case No. 4:23-cv-00115) (the "Securities Action"). The Securities Action alleges a putative class period of February

---

[1] *See* https://www.commerce.senate.gov/2023/2/executive-session.
[2] *See* https://www.transportation.gov/briefing-room/dot-penalizes-southwest-airlines-140-million-2022-holiday-meltdown.

4, 2020 through March 14, 2023. As of February 23, 2024, the parties to the Securities Action had fully briefed a motion to dismiss the amended complaint and were awaiting a hearing.

6.      On March 24, 2023, Plaintiff served an inspection demand on Southwest's Board of Directors (the "Board") under the Tex. Bus. Orgs. Code § 21.218 and subsequently received access to a set of Company documents on July 25, 2023. That access was granted pursuant to a Confidentiality and Non-Disclosure Agreement that currently bars Plaintiff from referencing those materials herein until certain conditions outside of Plaintiff's control have been met.

7.      On December 8, 2023, Plaintiff made a pre-suit demand on the Board to investigate and pursue breach of fiduciary duty and other claims against those responsible for the conduct described herein as required by Tex. Bus. Orgs. Code § 21.553 (the "Litigation Demand"). The Board has ignored Plaintiff's Litigation Demand.

8.      This action seeks to recoup losses that Southwest has sustained and will sustain in connection with the Individual Defendants' misconduct.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9), and claims for contribution under Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f)(5)(A)-(D) and § 78u-4(f)(8). In connection with the acts, conduct, and other wrongs complained of herein, defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12.     This Court has personal jurisdiction over each of the defendants named herein because they either reside in this District or have sufficient minimum contacts with this District to render this Court's exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Southwest is incorporated in Texas, at least one defendant resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

## PARTIES

*Plaintiff*

15.     Plaintiff Donna Hickok is a Southwest shareholder and has continuously owned Southwest stock since December 26, 2019. Plaintiff is a citizen of Kansas.

*Nominal Defendant*

16.     Nominal Defendant Southwest Airlines Co. is a Texas corporation headquartered in Dallas, Texas. Southwest's common stock trades on the New York Stock Exchange under the ticker symbol "LUV." Southwest is a citizen of Texas.

5

***Individual Defendants***

17.     Defendant David W. Biegler has served as a Southwest director since 2006. Biegler serves as Chair of the Compensation Committee and as a member of the Executive Committee and Safety and Compliance Oversight Committee. On information and belief, Biegler is a citizen of Texas.

18.     Defendant J. Veronica Biggins has served as a Southwest director since 2011. Biggins serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. On information and belief, Biggins is a citizen of Georgia.

19.     Defendant Douglas H. Brooks has served as a Southwest director since 2010. Brooks serves as a member of the Compensation Committee, Nominating and Corporate Governance Committee, and Operations Review Committee. On information and belief, Brooks is a citizen of Texas.

20.     Defendant William H. Cunningham, Ph.D. has served as a Southwest director since 2000. Cunningham serves as a member of the Audit Committee, Nominating and Corporate Governance Committee, and Executive Committee. On information and belief, Cunningham is a citizen of Texas.

21.     Defendant John G. Denison served as a Southwest director from 2008 until May 2023. On information and belief, Denison is a citizen of Texas.

22.     Defendant Thomas W. Gilligan, Ph.D. has served as a Southwest director since 2015. Gilligan serves as a member of the Audit Committee and Nominating and Corporate Governance Committee. On information and belief, Gilligan is a citizen of California.

23.     Defendant David P. Hess has served as a Southwest director since November 2021. Hess serves as Chair of the Safety and Compliance Oversight Committee and as a member of the

6

Audit Committee and Operations Review Committee. On information and belief, Hess is a citizen of Texas.

24.      Defendant Robert E. Jordan has served as Southwest's CEO and as a director since February 2022. Jordan has been with Southwest since 1990, including as its President since January 2023, Executive Vice President of Corporate Services from July 2017 to February 2022, and Chief Commercial Officer from September 2011 to July 2017. Jordan serves as a member of the Executive Committee. Jordan is named as a defendant in the Securities Action. On information and belief, Jordan is a citizen of Texas.

25.      Defendant Gary C. Kelly has served as Southwest's Executive Chairman since February 2022. Kelly was Southwest's CEO from July 2004 to February 2022. Kelly has been with Southwest since 1986, including as its President from July 2008 to January 2017 and CFO from June 2001 to July 2004. Kelly serves as Chair of the Executive Committee. Kelly is named as a defendant in the Securities Action. On information and belief, Kelly is a citizen of Texas.

26.      Defendant Grace D. Lieblein served as a Southwest director from January 2016 until May 2022. Lieblein was a member of the Compensation Committee and Safety and Compliance Oversight Committee. On information and belief, Lieblein is a citizen of Michigan.

27.      Defendant Nancy B. Loeffler served as a Southwest director from 2003 until May 2023. Loeffler was a member of the Compensation Committee and Nominating and Corporate Governance Committee. On information and belief, Loeffler is a citizen of Texas.

28.      Defendant John T. Montford, J.D. served as a Southwest director from 2002 until his resignation in May 2024. Montford served as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. On information and belief, Montford is a citizen of Texas.

29.     Defendant Christopher P. Reynolds has served as a Southwest director since May 2022. Reynolds serves as a member of the Compensation Committee and Safety and Compliance Oversight Committee. On information and belief, Reynolds is a citizen of Texas.

30.     Defendant Ron Ricks served as Southwest's Vice Chairman from July 2015 until his resignation in May 2024. Ricks joined the Company in 1986. Ricks served as Chair of the Operations Review Committee and as a member of the Compensation Committee, Safety and Compliance Oversight Committee, and Executive Committee. On information and belief, Ricks is a citizen of Texas.

31.     Defendant Ryan C. Green has served as Southwest's Executive Vice President and Chief Commercial Officer since October 2022. Green also served as the Senior Vice President and Chief Marketing Officer from February 2019 to October 2022. Green joined the Company in 2002. On information and belief, Green is a citizen of Texas.

32.     Defendant Thomas M. Nealon served as Southwest's President from January 2017 to September 13, 2021. Prior to that, Nealon served as Executive Vice President of Strategy and Innovation from January 2016 to January 2017. Nealon also served on the Company's Board of Directors from December 2010 until November 2015. Nealon is named as a defendant in the Securities Action. On information and belief, Nealon is a citizen of Texas.

33.     Defendant Tammy Romo has served as Southwest's Executive Vice President and CFO since July 2015. Romo has been with Southwest since 1991. Romo is named as a defendant in the Securities Action. On information and belief, Romo is a citizen of Texas.

34.     Defendant Linda Rutherford has served as Southwest's Chief Administration Officer since October 2022. Rutherford has been with Southwest since 1992. On information and belief, Rutherford is a citizen of Texas.

8

35.     Defendant Mark R. Shaw served as Southwest's Chief Legal and Regulatory Officer from November 2018 until his resignation effective June 1, 2024. Shaw worked at Southwest since 2000. On information and belief, Shaw is a citizen of Texas.

36.     Defendant Michael G. Van de Ven served as Southwest's COO from May 2008 through September 2022. Van de Ven also served as President from September 2021 through December 2022. Van de Ven is named as a defendant in the Securities Action. On information and belief, Van de Ven is a citizen of Texas.

37.     Defendant Andrew Watterson has served as Southwest's COO since October 2022. Watterson has been with Southwest since October 2013. Watterson is named as a defendant in the Securities Action. On information and belief, Watterson is a citizen of Texas.

38.     Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Lieblein, Loeffler, Montford, Reynolds, and Ricks are collectively referred to herein as the "Director Defendants."

39.     The Director Defendants and Defendants Green, Nealon, Romo, Rutherford, Shaw, Van de Ven, and Watterson are collectively referred to herein as the "Individual Defendants."

40.     Defendants Jordan, Kelly, Nealon, Romo, Van de Ven, and Watterson, named as defendants in the Securities Action, are collectively referred to herein as the "Contribution Defendants."

***Non-Party Directors***

41.     Non-party Lisa M. Atherton has served as a Southwest director since May 2024. Atherton serves as a member of the Compensation Committee and Nominating and Corporate Governance Committee.

42.     Non-party Roy Blunt has served as a Southwest director since July 2023. Blunt serves as a member of the Audit Committee and Safety and Compliance Oversight Committee.

43.     Non-party Eduardo F. Conrado has served as a Southwest director since May 2023. Conrado serves as a member of the Audit Committee and Safety and Compliance Oversight Committee.

44.     Non-party Elaine Mendoza has served as a Southwest director since May 2023. Mendoza serves as a member of the Audit Committee and Safety and Compliance Oversight Committee.

45.     Non-party Jill Soltau has served as a Southwest director since February 2023. Soltau serves as a member of the Compensation Committee and Nominating and Corporate Governance Committee.

## SUBSTANTIVE ALLEGATIONS

### A.     Overview of the Company and Regulatory Landscape

46.     Southwest operates a major passenger airline that provides scheduled air transportation in the United States and near-international markets. As of December 31, 2023, Southwest had a total of 817 Boeing 737 aircraft in its fleet and served 121 destinations in 42 states, the District of Columbia, the Commonwealth of Puerto Rico, and ten near-international countries, including Mexico, Jamaica, The Bahamas, Aruba, Dominican Republic, Costa Rica, Belize, Cuba, the Cayman Islands, and Turks and Caicos.

47.     According to the Company,  Southwest has principally provided "point-to-point" service, rather than the "hub-and-spoke" service provided by most major U.S. airlines. A point-to-point system enables airlines to connect directly to destinations without providing a connecting service. By contrast, the hub-and-spoke system concentrates most of an airline's operations at a

limited number of central hub cities and serves most other destinations in the system by providing one-stop or connecting service through a hub. The Company claims that by not concentrating operations exclusively through one or more central transfer points, Southwest's route structure has allowed for more direct nonstop routing than a traditional hub-and-spoke service.

48.     According to the DOT,[3] Southwest is an "air carrier" as defined by 49 U.S.C. § 40102(a)(2) and is subject to the requirements of 49 U.S.C. § 41712 ("Section 41712"), which prohibits an air carrier, foreign air carrier, or a ticket agent from engaging in an unfair or deceptive practice in air transportation or the sale of air transportation. A practice is unfair under 14 CFR § 399.79(b)(1) if it (1) causes or is likely to cause substantial injury to consumers, (2) cannot be reasonably avoided by consumers, and (3) is not outweighed by countervailing benefits to consumers or to competition. A practice is deceptive under 14 CFR § 399.79(b)(2) if it is likely to mislead a consumer, acting reasonably under the circumstances, with respect to a material matter. Under 14 CFR § 399.79(d), where an existing regulation applies to the practice of an air carrier, foreign air carrier, or ticket agent, the terms of that regulation apply, rather than the general definitions of unfair or deceptive.

49.     The DOT has found that "An airline's practice of not providing adequate call center assistance when the carrier cancels or significantly changes a passenger's flight is unfair as it causes *substantial harm* to consumers," adding: "Consumers are substantially harmed when they are stranded and need help to rebook flights and are unable to reach a customer service representative at all or in a reasonable amount of time by phone." (Emphasis in original.) The DOT

---

[3] *See* Consent Order at 2-4.

also stated that the harm is "not reasonably avoidable" by consumers and that it is "not outweighed by countervailing benefits to consumers or to competition."

50.     The DOT further stated that not providing adequate customer service assistance is both unfair *and* deceptive because (a) "Consumers are misled to believe that they will receive assistance through call centers within a reasonable period," (b) "Consumers acting reasonably do not expect to face" these types of problems, and (c) their impacts are "material" to the affected consumers.

51.     Under 14 CFR § 259.8(a), covered carriers must promptly provide to passengers who are ticketed or hold reservations, and to the public, information about a change in the status of a flight within 30 minutes after the carrier becomes aware of such a change. A change in the status of a flight means, at a minimum, a cancellation, diversion, or delay of 30 minutes or more in the planned operation of a flight that occurs within seven calendar days of the scheduled date of the planned operation. Under 14 CFR § 259.8(a)(1), when carriers permit passengers and other interested persons to subscribe to flight status notification services, the carrier must deliver such notifications to subscribers by whatever means the carrier offers that the subscriber chooses within 30 minutes of the carrier becoming aware of a change in a flight's status. A carrier's failure to comply with 14 CFR § 259.8(a) constitutes an unfair and deceptive practice within the meaning of Section 41712. The DOT has long considered it an unfair and deceptive practice when a "carrier's failure to obtain and pass on to consumers up-to-date and accurate information is caused by the carrier's own procedural shortcomings." *See* 76 Fed. Reg. 23155 (April 25, 2011).

52.     Under 14 CFR § 259.5, U.S. and foreign air carriers operating at least one aircraft having a seating capacity of 30 or more seats must adopt a Customer Service Plan and adhere to the Plan's terms. The Customer Service Plan must include certain commitments relating to the

payment of refunds to passengers when required by Section 41712. Under 14 CFR § 259.5(b)(5), when ticket refunds are due, carriers must provide them within seven business days of receipt of a written request from the consumer for credit card purchases (*see* 14 CFR § 374.3 and 12 CFR Part 1026) and within 20 days of receipt of a completed refund request for cash and check purchases, including refunding fees charged to a passenger for optional services that the passenger was unable to use due to an oversale or flight cancellation. The DOT considers refunds to be "due" when failure to provide them would constitute an unfair or deceptive practice under Section 41712.

53.     Beyond the federal laws and regulations applicable to air carriers as described above, Southwest's officers and directors are also subject to Texas state and federal laws establishing their fiduciary duties to Company shareholders.

54.     Directors and officers of a Texas corporation, like Southwest, owe fiduciary duties to the Company's shareholders. By reason of their positions as officers and directors, and because of their ability to control the business and affairs of Southwest, the Individual Defendants each owed to Southwest and its shareholders the fiduciary duties of care, loyalty, obedience, and good faith. The Individual Defendants are required to control and manage Southwest in a fair, just, honest, and equitable manner.

55.     The Individual Defendants, because of their positions of control and authority as officers and directors of Southwest, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

56.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and

controls of the Company. The conduct of the Individual Defendants alleged herein violated their fiduciary duties as Southwest officers and directors.

57.     Under Section 14(a) of the Exchange Act, the Director Defendants have a duty to make truthful disclosures and representations in the Company's annual proxy statements. Specifically, Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, states that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. In accordance with federal securities law, Southwest's officers and directors are prohibited from making any material misrepresentation or omission in connection with the solicitation of proxy votes from Southwest's shareholders.

58.     The Director Defendants also have obligations under the Company's corporate governance guidelines and related policies and charters. According to Southwest's Corporate Governance Guidelines, the Company's Board of Directors is required to promote the best interests of the Company and its shareholders by overseeing the management of the Company's business. The guidelines state that the Director Defendants, as members of the Board, are charged with the following responsibilities and obligations: (a) the duty of care, which requires that Board members exercise appropriate diligence in making decisions and in overseeing management; and (b) the duty of loyalty, which generally requires that Board members make decisions based on the best interests of the Company's shareholders and without regard to any personal interest. The guidelines also state, among other things, that the Board is responsible for assessing major risks facing the Company and for reviewing options to mitigate such risks and overseeing the processes to maintain the utmost integrity and proper management of the Company.

59.     The Company's Audit Committee is tasked with assisting the Board with its oversight responsibilities by discussing the Company's major financial risk exposures, its guidelines and policies with respect to risk assessment and risk management, and the steps management has taken to monitor and control or mitigate financial risk exposures. The Audit Committee is also responsible for, among other things, reviewing with management (a) the Company's technology and cyber security frameworks, policies, programs, opportunities, and risk profile at regularly scheduled meetings; and (b) the Company's business continuity and disaster recovery plans and capabilities and the effectiveness of the Company's escalation procedures. The Audit Committee is also responsible for discussing with management, as well as the Company's Internal Audit Department (including in executive sessions), the Company's guidelines and policies regarding risk assessment and risk management as well as advising management on its risk assessment approach and its prioritization of risks.

60.     The Company's Operations Review Committee is charged with: (a) overseeing management's efforts to identify the causes and mitigate the effects of the Company's December 2022 operational disruption and, if feasible, to enhance and remediate the Company's processes and operations to reduce the likelihood of such a significant and prolonged disruption to flights in the future; (b) receiving reports from management and from such third parties as management or the Operations Review Committee may deem advisable with respect to such matters and operations; and (c) if the Operations Review Committee determines it to be advisable, recommending to the Board further enhancements of the Board's processes to oversee air carrier operations risks.

**B.     The December 2022 Travel Meltdown**

15

61.     Between approximately December 21, 2022 and January 2, 2023, Winter Storm Elliott wreaked havoc on Southwest's dated software infrastructure, causing the Company to cancel nearly 17,000 flights across several states, stranding over two million passengers during the busiest travel period of the year.

62.     Because Southwest's point-to-point flight model does not give it the flexibility to manage or modify crew assignments at major hub airports, as with a hub-and-spoke model, the Company must ensure that each destination is adequately staffed. Thus, a strong crew management system is integral to Southwest's success and reliability as a passenger carrier. However, since the 1990s, Southwest has used a patchwork of aging software systems to schedule its crew operations, including a proprietary system known as "Baker" and another system called "SkySolver."

63.     The SkySolver system was used for assigning pilots and crew members to specific flights. SkySolver, a customized, off-the-shelf software program, was originally developed in the 1990s on decades-old computer technology, meaning that it lacked the kind of simultaneous-processing capacity required of an organization the size of Southwest. When SkySolver fails to function, as it did in December 2022, Southwest employees are left to reassign crew members manually.

64.     The Baker system, proprietary to Southwest, was used for making adjustments to planes and flight schedules. But it did not integrate well with SkySolver's crew assignment processes, so the Company was relying on two separate pieces of technology to manage its crew and flight scheduling changes during times of stress with no effective coordination between them. This meant that flight changes proposed by the Baker system often made bad assumptions regarding crew availability. As SWAPA explained in a January 6, 2023 article: "Baker [] has

16

minimal programming pertaining to crew, and you end up with a recovery plan that looks pretty but is doomed because it isn't aligned with crew availability."[4]

65.     Winter Storm Elliott pushed the Company's technology beyond its capacity and caused a complete breakdown of these crew management systems. Without a functioning crew management system, employees resorted to manually matching crew members with flights. That effort was hopelessly inadequate in light of the high volume of flight cancellations and the various restrictions and regulations that govern the employment of airline employees.

66.     Notably, though Elliott was indeed a strong storm, Southwest's competitors fared significantly better in the same conditions. The storm itself lasted approximately five days, ending on or around December 26, 2022, but due to Southwest's significant software management problems, the Company was forced to cancel a substantial number of flights even *after* the storm ended. As the storm abated, every major airline—except Southwest—was able to recover from the disruptions and return to normal operations. In contrast, Southwest continued to cancel flights over the next several days.

67.     On December 27, 2022, the Twitter user "xJonNYC," apparently an aviation insider, published a transcript of a private conference call between Defendant Jordan, Defendant Watterson, and Southwest employees in which Defendant Jordan admitted that Southwest had a "lack of tools," telling employees: "We've talked a little bit over the last year about the need to modernize the operation and invest. This is why. We can't be our size and scope and have a lack of tools."[5] Defendant Watterson then admitted: "We had aircraft that were available, but the process of matching up those crew members with the aircraft could not be handled by our

---

[4] *See* https://www.swapa.org/news/2023/swapa-provides-in-depth-look-at-winter-meltdown/.
[5] *See* https://twitter.com/xJonNYC/status/1607605404128743426.

technology. In our desired state, we have a solver [meaning a software system] that would be able to do that very quickly and very accurately. Our system today cannot do that."

### C.     Southwest's Long History of Similar Problems and Warnings

68.     None of this was a surprise to the Individual Defendants. Capt. Murray of SWAPA published an article on July 12, 2021—more than a year before the meltdown—in which he noted that SWAPA had been warning Southwest about its aging software systems since at least 2014, writing: "It has gone on for years as VP after VP has recognized these same issues and yet nothing ever changed for our Pilots. During the 2014 Midway Meltdown, dozens of crews were stranded without hotels and with no way to reach Crew Scheduling."[6]

69.     In 2016, the SWAPA board of directors passed a vote of no confidence on the Company's then-CEO Defendant Kelly because of Kelly's unwillingness to make adequate investments to update the Southwest's IT infrastructure.[7]

70.     Presciently, on November 12, 2022, Capt. Murray stated on a podcast: "I fear that we are one thunderstorm, one [air traffic control] event, one router brownout from a complete meltdown. Whether that's Thanksgiving, or Christmas, or New Year, that's the precarious situation we are in."[8] In an article published on December 31, 2022, SWAPA's 2nd Vice President Capt. Tom Nekouei added that "SWAPA has been beating this drum to management for nearly a decade pleading with them to spend the necessary capital to prevent the ultimate consequence someday."[9]

---

[6] *See* https://www.swapa.org/news/2021/investing-in-the-operation/.
[7] *See* https://www.prnewswire.com/news-releases/southwest-airlines-pilots-union-board-completes-20-0-vote-of-no-confidence-in-southwest-ceo-gary-kelly-300306888.html.
[8] *See* https://www.swapa.org/news/2022/two-legacies/.
[9] *Id*.

71.     SWAPA and others had been giving these warnings for a reason: the Company had been repeatedly experiencing operational meltdowns just like the one that did so much damage in December 2022. For example, in 2014, Southwest experienced a similar technology failure resulting in a mass-cancellation event, dubbed by SWAPA the "Midway Meltdown." SWAPA attributed the Midway Meltdown to an untenable flight schedule (*i.e.*, too many flights) which resulted in an influx of short-notice cancellations, stretching the Company's systems beyond their capacity. Southwest's crew scheduling technology as well as the backup lines of communication between crews and the central scheduling department failed. As a result, dozens of crews were stranded without hotels and with no way to reach the scheduling department. After the Midway Meltdown, SWAPA raised the issue of the technology failure with Southwest management, including Defendants Kelly and Van de Ven.

72.     In July 2016, Southwest experienced another technology failure and cancelled over 1,000 flights in a 24-hour period. During what SWAPA called the "Router Brownout"—which would typically be a minor inconvenience for most airlines—a cascading series of problems occurred, including a breakdown in communications, and hundreds of cancelled flights. Southwest attributed the Router Brownout to a "computer glitch," and Defendant Kelly compared it to a "thousand-year flood." Defendant Kelly further explained that, "Like it or not, we live with some old technology." After the Router Brownout, SWAPA again warned the Company to invest in technology, but Southwest management, especially including Defendants Kelly and Van de Ven, failed to heed the warnings.

73.     The prior meltdowns continued: in June 2021, a similar technology problem caused the Company to cancel or delay half its flights over an approximately 36-hour period. In October 2021, bad weather led Southwest to reschedule over 2,000 flights over a busy holiday weekend

because crews were not available where they were needed. SWAPA President Capt. Murray said that this October 2021 incident should have been a "wake-up call" to Southwest management as it bore all the hallmarks of the December 2022 travel meltdown. The October 2021 incident cost the Company $75 million.

74.     Given these prior warnings and incidents, the Individual Defendants had no excuse for failing to modernize the Company's technology systems when they had the chance. Indeed, Defendant Jordan admitted as much in November 2022—a month before the meltdown—stating: "I do think the scale and the growth of the airline got ahead of the tools that we have."[10]

**D.     February 2023 Senate Hearing**

75.     On January 12, 2023, several months before the DOT issued its historic penalty against Southwest, fifteen U.S. Senators sent a letter to Defendant Jordan demanding that he answer a series of questions on topics ranging from basic details about the incident to pointed questions concerning the status of refunds and baggage return, staffing issues, Southwest's use of dated software systems, and the payment of certain executive and shareholder compensation in the wake of the incident.[11]

76.     Then, on February 9, 2023, Defendant Watterson appeared before the U.S. Senate Committee on Commerce, Science, and Transportation.[12] In his written testimony,[13] Defendant Watterson took the opportunity to "sincerely and humbly apologize to those who were impacted

---

[10] *See* https://apnews.com/article/weather-storms-natural-disasters-dallas-business-5e83632df5d78f85af37c5ed2f602fee.

[11] *See* https://www.markey.senate.gov/imo/media/doc/senators_letter_to_southwest_airlines_-_january_2023pdf.pdf (PDF download).

[12] *See* https://www.commerce.senate.gov/2023/2/executive-session.

[13] *See* https://www.commerce.senate.gov/services/files/AA8C8107-7E17-43BB-80EA-42D8AA9C4E60 (PDF download).

by this disruption," adding: "Let me be clear: we messed up. In hindsight, we did not have enough winter operational resilience."

77.     Though Defendant Watterson was clearly wrong to invoke "hindsight" in his analysis, given the multitude of prior incidents and nearly a decade of warnings from the pilots union, he made it clear in his remarks that Southwest knew exactly what the problem was:

> As the storm moved east, other Southwest airports—large, medium and small in size—in the central and eastern part of the country began experiencing similar winter weather operational challenges. Communications among our Network Operations Control (NOC), local Station Control Centers, and Crew Scheduling deteriorated as the developing operational challenges continued. This lack of effective communication and coordination resulted in compounding, frequent, close-in flight cancellations, rather than our normal practice of batched pre-cancellations further in advance of departure times. This created an unprecedented amount and frequency of required changes to Crew schedules that overwhelmed our Crew Scheduling processes and technology.

78.     Defendant Watterson later said of the Company's crew scheduling systems:

> To be clear, our Crew Scheduling software didn't stop working during this event. However, the pace and volume of close-in Crew and schedule changes over multiple days left our Crew Scheduling professionals unable to efficiently address the state of the operation. As the situation escalated and close-in cancellations grew, Crew Scheduling simply couldn't keep up with the overwhelming volume of changes, resulting in individual Crew assignments not being updated in a timely manner. Without updated Crew schedules, the Crew decision support software could not reassign Crews to solve for flights with Crew coverage issues. Of the three moving parts in our point-to-point network—the flight network, the aircraft network, and the Crew network—and as far as our technology is concerned, the disruption primarily revealed a need to add functionality to our Crew Scheduling software to solve for a large backlog of broken Crew pairings.

79.     Looking forward, Defendant Watterson pledged that Southwest would spend the money necessary to identify and fix the root causes:

> In addition to the ongoing analysis being conducted by teams in several departments such as Flight Operations, Inflight Operations, Ground Operations, Network Planning, Crew Scheduling, Network Operations Control, and Operational Performance, we've also engaged an internationally-respected consultancy, Oliver Wyman, to do a third-party assessment and make recommendations to inform other mitigation efforts—such as opportunities to

21

improve performance on bad weather days. We've also asked our unions to participate in the work that is being conducted. With this third-party review, and our own review in hand, we will reassess the operational modernization plans we already had in place for 2023 and make any necessary changes in light of the challenges we experienced.

\* \* \*

For 2023, we are currently budgeted to spend $1.3 billion of our annual operating plan on investments, upgrades, and maintenance of our IT systems.

80.     Also at the Senate hearing, among others, was Capt. Murray of SWAPA. Capt. Murray and his organization, as representatives of the pilots who fly for Southwest, had been vocal about these issues for nearly a decade as explained above. In his written testimony,[14] Capt. Murray stated that he and the union "have been sounding the alarm about SWA's inadequate crew scheduling technology and outdated operational processes for years" but that "those warnings were summarily ignored." Capt. Murray continued:

What SWAPA Pilots saw – and have known for years – is that SWA struggles to manage nearly any disruption, regardless of the cause. Our recent history – and the data shows – a pattern of increasingly disruptive operational failures, mis-prioritization of resources, and hollow leveraging of our culture to cover up poor management decisions.

81.     Capt. Murray attributed the December 2022 travel meltdown to three root causes: "Failure to adequately prepare for Winter Storm Elliott[;] Failure to modernize crew management processes & related I.T. systems[;] and Failure of Leadership & the Normalization of Drift."

82.     Capt. Murray concluded his written testimony with the following: "But, like most disasters, it didn't happen overnight. Warning signs were ignored. Poor performance was condoned. Excuses were made. Processes atrophied. Core values were forgotten."

**E.     December 2023 DOT Penalty and Consent Order**

---

[14] *See* https://www.commerce.senate.gov/services/files/B8D729EC-5F96-4E8D-A902-F43DA29F2E08 (PDF download).

83.     On December 18, 2023, the DOT announced a record-breaking $140 million civil penalty against Southwest for its "numerous violations of consumer protection laws" in connection with the December 2022 flight cancellations.[15] A formal DOT Consent Order against the Company, dated December 15, was published concurrently with the announcement (the "Consent Order").[16]

84.     The penalty was historic. The DOT stated that it was "30 times larger than any previous DOT penalty for consumer protection violations," adding that it would be used for "compensating future Southwest passengers affected by cancellations or significant delays caused by the airline." U.S. Transportation Secretary Pete Buttigieg said of the penalty: "Taking care of passengers is not just the right thing to do—it's required, and this penalty should put all airlines on notice to take every step possible to ensure that a meltdown like this never happens again."

85.     The DOT stated that it conducted a "rigorous and comprehensive investigation," including substantial document review and witness interviews:

> DOT's rigorous and comprehensive investigation into Southwest's operations during the 2022 holiday season included examining tens of thousands of pages documents, conducting several multi-day, in-person audits and site visits at Southwest's headquarters, reviewing thousands of consumer complaints, and consulting with various third parties, such as airports. In addition, DOT regularly met with Southwest officials to gather information, ask questions, and ensure that any issues identified in the investigation were immediately addressed. DOT also reviewed Southwest's internal policies and processes for responding to consumer concerns and providing impacted consumers with compensation.

86.     Summarizing its findings, the DOT stated in its announcement that Southwest had violated consumer protection laws in three ways, including by failing to provide adequate customer

---

[15] *See* https://www.transportation.gov/briefing-room/dot-penalizes-southwest-airlines-140-million-2022-holiday-meltdown.

[16] *See* https://www.transportation.gov/airconsumer/southwest-order-2023-12-11.

service assistance, failing to provide prompt flight status notifications, and failing to provide

refunds in a prompt and proper manner:

> **Failing to provide adequate customer service assistance:** Hundreds of thousands of Southwest customers had their flights cancelled and were stranded at the airport, in hotels, and in other locations away from home. The scale of the cancellations left travelers scrambling for alternate flight reservations and other accommodations, but when Southwest customers contacted the company's customer service, they were often met with busy signals, hours-long queues to connect with agents, or dropped calls. DOT's investigation found that Southwest's call center was overwhelmed, which at times led to a full call center queue and meant customers got a busy signal upon calling the customer service telephone number.

> **Failing to provide prompt flight status notifications:** Southwest's policy states that it will update consumers about flight status changes via text or email, but during the holiday disruptions, many Southwest customers did not receive a flight status notification in any form, while others received inaccurate ones. Many passengers did not learn their flight had been cancelled until after arriving at the airport. DOT's investigation found that Southwest's process for notifying passengers broke down, and as a result, the airline failed to provide prompt notification of flight cancellations and delays.

> **Failing to provide refunds in a prompt and proper manner:** DOT's investigation included an audit of Southwest's refunds and reimbursements system to ensure that harmed passengers received what they were owed. DOT found that thousands of customers were not promptly refunded. For example, Southwest failed to notify customers that their submissions to the airline's refund request microsite contained errors that prevented them from receiving their refunds. After DOT's audit identified the issue, the airline subsequently refunded these consumers. Additionally, thousands of passengers were not provided prompt refunds for optional service fees, like pet fees or upgraded boarding, that they purchased but were never able to use due to significant delays or flight cancellations.

(Emphasis in original.)

87.     Of Southwest's failure to provide adequate customer service assistance, the DOT

stated its facts and conclusions as follows in the Consent Order:[17]

> Southwest promotes its call center as a way that its customers can talk to a customer service representative 24/7,[18] particularly during flight disruptions. When Southwest experienced its operational disruption in December 2022, numerous

---

[17] *See* Consent Order at 4-7 for the DOT's facts and conclusions.
[18] https://mobile.southwest.com/contact-us. (Citation as provided in Consent Order, at 4.)

Southwest customers had their flights cancelled and were stuck in airports, at hotels, and in locations away from home. The scale of the disruption left travelers scrambling for hotels, ground transportation, alternative flight reservations, rebooking options, and with many other concerns. When many of these passengers attempted to call Southwest for assistance, Southwest's customer care telephone system was not able to handle the volume of consumer calls. In consumer complaints submitted to OACP, some consumers complained that they received a busy signal when attempting to contact Southwest, while others reported an inability to successfully connect with Southwest's telephone reservations system. OACP also received complaints alleging passengers were forced to wait on hold for many hours to connect with a Southwest agent. In some of these cases, consumers complained that their calls would suddenly drop after waiting on hold for hours. Some consumers attached cellphone screenshots to their complaints that displayed the number of hours they had been on hold attempting to contact Southwest.

OACP's investigation found that Southwest's call center was overwhelmed, which, at times, led to a full call center queue and a busy signal upon calling Southwest's customer service telephone number (1-800-I-FLY-SWA). OACP also learned that Southwest's calls, at times, sounded garbled or choppy. Moreover, OACP found that the carrier was forced to drop thousands of calls to reinstate hold music that had suddenly stopped playing which had the effect of causing countless callers to believe that Southwest's telephone systems were not working at all. For those callers who were able to successfully call the Southwest customer care telephone number, OACP has learned from consumer complaints that, in certain instances, callers had to wait hours to speak to a Southwest representative. Due to these various issues, for several days in December 2022, Southwest published a public notice on its website stating, "Due to the very high demand from Winter Storm Elliot, our hold times are currently averaging more than 2 hours and have been as high as four hours." Southwest also published notices on its website advising consumers of "busy signals," "garbled calls or static on calls," and a lack of hold music, which led consumers to believe the Southwest telephone number was not working.

88.    Of Southwest's failure to provide prompt flight status notifications, the DOT stated

its facts and conclusions as follows in the Consent Order:

Southwest publicly states that it will update consumers about flight status changes using the contact information listed in the reservation via text or email.[19] Southwest also states that consumers may use the carrier's flight status lookup tool on southwest.com or its apps to track the status of flights. However, OACP received complaints indicating that, between December 19-29, 2022, many consumers did

_____

[19] https://www.southwest.com/html/air/flight-status-notifications-conditions.html. (Citation as provided in Consent Order, at 5.)

not receive any flight status notifications via email, text message, cellphone app, or other communication channels. Other consumers stated that the updates they received were inaccurate or outdated and ineffective. Many consumers complained that they could not access Southwest's website during the operational irregularities to obtain flight status information due to apparent errors with the carrier's website and only found out that their flight had been cancelled after driving to the airport.

OACP's investigation revealed that, on numerous occasions, Southwest failed to provide prompt flight status notifications via the carrier's automated outbound messaging (AOM) system during the December 2022 operational meltdown. Between December 19-29, 2022, Southwest's process for sending AOM flight status notifications to passengers failed, causing flights status notifications to be delayed and/or inaccurate. Other flight status notifications were not sent until after the scheduled departure time of the flight.

89.     Of Southwest's failure to provide refunds in a prompt and proper manner, the DOT

stated its three-part facts and conclusions as follows in the Consent Order:

A. Non-Transferrable Residual Travel Funds

In early 2023, OACP received consumer complaints from passengers who purchased all, or a portion of, their travel with a Southwest gift card, had their flight cancelled or significantly delayed by Southwest, and subsequently requested a refund. The Southwest gift card used to purchase the ticket was non-expiring and transferable. These consumers alleged that after submitting a legitimate refund request to Southwest, the carrier provided them with a non-transferrable residual travel fund (RTF) instead of a check, similar gift card, or non-expiring transferrable travel voucher.

OACP's investigation confirmed that, in some instances, Southwest provided non-expiring (non-transferrable) RTFs to travelers who purchased all, or a portion of, their travel with a Southwest gift card, had their flight cancelled or significantly delayed by Southwest, and subsequently requested a refund. Although Southwest provided non-expiring transferrable RTFs for some fares (Business Select, Anytime, and Wanna Get Away Plus), OACP found that Southwest provided non-expiring (but non-transferrable) RTFs to other fare classes (Wanna Get Away) in thousands of instances. After OACP brought the issue to the carrier's attention, Southwest then converted the non-expiring RTFs to make them transferrable.

B. Southwest's Microsite

Prior to December 2022, Southwest accepted refund requests through three channels: 1) their customer call center; 2) ticket counters at various airports; and 3)

the "Contact Us"[20] option on the carrier's website. In December 2022, Southwest built a "Microsite" website[21] to allow consumers to submit refund requests using three pieces of information: 1) first name; 2) last name; and 3) passenger name record (PNR). While the Microsite enabled Southwest to assist the vast majority of passengers by processing refund requests quickly, the Microsite's design, in some cases, adversely impacted consumers.

Specifically, OACP's investigation revealed that Southwest considered all refund requests submitted through the Microsite that did not contain exact information to be "invalid" requests. Of the three pieces of information required to submit a refund request through the Microsite (first name, last name, and PNR), a passenger had to input this information in without an error or Southwest's microsite would not accept the refund request and would consider the request "invalid." The Department found that in many cases, consumers (possibly using cell phones, tablets, and other portable electronic devices) input a slightly incorrect PNR when making a refund request, at times, mistaking the number 0 for the letter "O" or the number 1 for the letter "l" in their PNR or making a similar error. An "invalid" refund request was not processed by Southwest and no refund was provided unless the passenger made an additional refund request.

However, during its investigation, the Department learned that consumers did not know to make an additional request, because Southwest did not notify consumers that their refund requests were not being processed due to an error. Southwest did not obtain contact information from consumers requesting refunds through the Microsite and made no attempt to contact consumers whose requests included an error. Also, Southwest's Microsite provided no error message or other type of communication alerting the consumer that there could be a problem. This led thousands of consumers to believe that they had submitted a refund request that would be promptly processed within the timeframes required by law when this was not occurring. As a result, many consumers were deprived of funds owed to them following the December 2022 holiday travel disruptions. Southwest subsequently identified and refunded these consumers, but only after OACP conducted an audit of Southwest records and identified the issue.

### C. Refunds of Ticket Purchases and Optional Service Fees

Between December 21, 2022, and January 31, 2023, OACP received numerous consumer complaints alleging that Southwest failed to provide prompt refunds of

---

[20] https://www.southwest.com/html/contact-us/. (Citation as provided in Consent Order, at 6.)
[21] The Southwest refund Microsite was formerly housed at
https://www.southwest.com/traveldisruption/[...]. (Footnote and citation as provided in Consent Order, at 6; edited to remove statement regarding Company website that is no longer true.)

both the ticket cost and the cost of optional service fees after a valid refund request.[22]

While Southwest properly handled the vast majority of refund requests, OACP's investigation found that Southwest did not promptly process refund requests made through the Microsite unless the passenger making the request had a cancelled or significantly delayed flight that was scheduled to operate between December 24, 2022, and January 2, 2023. In other words, although the Microsite was built to allow Southwest to quickly process refund requests received following Winter Storm Elliott, its design prevented refund requests submitted for travel between December 21-23, 2022, from being promptly processed. Additionally, OACP's investigation revealed that Southwest did not notify consumers that the Microsite was designed only to accept refund requests for consumers whose scheduled flight date was between December 24, 2022, and January 2, 2023, until sometime on December 29, 2022. Accordingly, consumers who visited the Microsite webpage prior to that date/time, were not advised that refund requests made through the webpage would only be accepted if their flight was scheduled to take place between December 24, 2022, and January 2, 2023. Ultimately, Southwest failed to provide prompt refunds to thousands of consumers who were scheduled to travel between December 21-23, 2022, had their flight cancelled or significantly delayed, and submitted a refund request though Southwest's Microsite.

Furthermore, during one of the Department's audits of Southwest, OACP learned that Southwest recycled the six-character alphanumeric PNRs (Passenger Name Records also known as "confirmation numbers") that the carrier uses to identify passengers and their flight itineraries. As a result, the same PNR used to identify a passenger and their flight itinerary on a given date was used again on a subsequent date to identify a separate new passenger and flight itinerary. Upon reviewing Southwest refund records, OACP discovered a technological error related to Southwest's recycling of PNRs. Specifically, when processing refund requests related to the December 2022 disruption, Southwest mixed up the name that corresponded to a given recycled PNR on many occasions. Due to this "name mismatch" error, Southwest rejected numerous refund requests because the name on the submitted request did not match the PNR associated with the travel. Southwest did not provide refunds to these affected passengers until the Department alerted Southwest to their error, at which point, the refunds provided to passengers were late.

In addition to the above issues, the Department found that Southwest failed to provide prompt refunds of some optional service fees (e.g., pet fees, upgraded boarding) to thousands of consumers who purchased, but were unable to use,

---

[22] Southwest optional service fees include: upgraded boarding, unaccompanied minor, EarlyBird check-in, pet fees, and overweight or excess baggage fees. (Footnote as provided in the Consent Order, at 7.)

optional service fees due to the significant delay or cancellation of their planned travel.

90.     The DOT tabled an investigation into whether Southwest had also engaged in the practice of "unrealistic scheduling," conspicuously noting in the Consent Order that the decision was made "in the interest of settlement" and that the agency made no findings on it one way or the other:

> In the interest of settlement, the Department is closing its investigation into whether Southwest engaged in unrealistic scheduling of flights and will not bring an enforcement action against Southwest involving unrealistic scheduling related to Southwest's December 2022 travel disruptions. The Department is not making a finding that Southwest did, or did not, engage in unrealistic scheduling. Under federal law, unrealistic scheduling is considered an unfair and deceptive practice.

91.     The Individual Defendants could have avoided all of this costly damage—both to the Company and to affected travelers—if it had acted responsibly in light of its long history of similar incidents and repeated warnings from its pilots union.

**F.     False and Misleading Statements and Omissions**

92.     Between at least February 4, 2020 and March 14, 2023, Southwest failed to disclose the abject state of the Company's flight- and crew-management software systems and made false and misleading disclosures concerning the Individual Defendants' oversight of major risks affecting the Company.

93.     For example, in the Company's 2020 proxy statement, filed on April 9, 2020, Southwest stated: "The Board is responsible for overseeing management's assessments of major risks facing the Company and for reviewing options to mitigate such risks. The Board's oversight of major risks occurs at both the full Board level and at the Board committee level." Of the full Board, the proxy statement continued:

> The Chief Executive Officer, the President, the Chief Operating Officer, members of senior management, and other personnel and advisors, as requested by the Board,

report on the Company's financial and operating strategies, as well as any related risks, at every regular meeting of the Board. Based on these reports, the Board requests follow-up data and presentations to address any specific concerns and recommendations.

94.    The 2020 proxy statement represented that the Audit Committee "assists the Board with its oversight responsibilities by discussing the Company's major financial risk exposures, its guidelines and policies with respect to risk assessment and risk management, and the steps management has taken to monitor and control or mitigate financial risk exposures." Of the Audit Committee's specific duties, the proxy statement continued:

> The Audit Committee discusses with the Company's management, as well as the Company's Internal Audit Department (including in executive sessions), the Company's guidelines and policies with respect to risk assessment and risk management and advises management on its risk assessment approach and its prioritization of risks. The Audit Committee also receives regular reports on, and assessments of, the Company's internal controls from the Company's Internal Audit Department and members of management responsible for financial controls. In addition, the Audit Committee receives the independent auditor's assessment of the Company's internal controls and financial risks, which includes the independent auditor's report on its procedures for identifying fraud and addressing any risk of management override. The Audit Committee also receives management reports regarding specific areas of financial risk and discusses strategies to mitigate risk.

95.    The 2020 proxy statement represented that the Safety and Compliance Oversight Committee "assists the Board with overseeing the Company's activities with respect to safety and operational compliance," adding:

> Pursuant to its Charter, the Safety and Compliance Oversight Committee is responsible for periodically assessing the Company's safety and operational compliance obligations and associated risks and performance relative to those standards. In fulfilling this responsibility, the Safety and Compliance Oversight Committee regularly specifies areas to be addressed at its meetings and requires that individuals from a variety of operational areas and levels be available to discuss their areas of responsibility and respond to questions.

96.    On the basis of the false and misleading representations and omissions in the 2020 proxy statement, Southwest solicited shareholders to approve executive compensation and to elect

Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Kelly, Lieblein, Loeffler, Montford, and Ricks to the Company's Board. The solicitations were successful.

97.     On the basis of the false and misleading representations and omissions in the 2020 proxy statement, Southwest also solicited shareholders to reject a proposal to establish an independent Board chairperson. The proposal failed following the Company's solicitation. The Board unanimously urged shareholders to vote against the proposal, stating in part:

> The Board believes Shareholder interests are best served if the Board retains the flexibility to select a leadership structure it believes to be in the best interests of the Company and the Company's Shareholders at any given time. This proposal neglects to state any Company-specific facts or issues that would justify eliminating this flexibility.

> * * *

> The Board believes that its governance practices as a whole serve to provide effective independent oversight of management.

98.     In the Company's 2021 proxy statement, filed on April 9, 2021, Southwest stated: "The Board is responsible for overseeing management's assessments of major risks facing the Company and for reviewing options to mitigate such risks. The Board's oversight of major risks occurs at both the full Board level and at the Board committee level." Of the full Board, the proxy statement continued:

> The Chief Executive Officer, the President, the Chief Operating Officer, members of senior management, and other personnel and advisors, as requested by the Board, report on the Company's financial, operating, and commercial strategies, as well as any related risks, at every regular meeting of the Board. Based on these reports, the Board requests follow-up data and presentations to address any specific concerns and recommendations.

99.     The 2021 proxy statement represented that the Audit Committee "assists the Board with its oversight responsibilities by discussing the Company's major financial risk exposures, its guidelines and policies with respect to risk assessment and risk management, and the steps

management has taken to monitor and control or mitigate financial risk exposures." Of the Audit

Committee's specific duties, the proxy statement continued:

> The Audit Committee discusses with the Company's management, as well as the Company's Internal Audit Department (including in executive sessions), the Company's guidelines and policies with respect to risk assessment and risk management and advises management on its risk assessment approach and its prioritization of risks. The Audit Committee also receives regular reports on, and assessments of, the Company's internal controls from the Company's Internal Audit Department and members of management responsible for financial controls. In addition, the Audit Committee receives the independent auditor's assessment of the Company's internal controls and financial risks, which includes the independent auditor's report on its procedures for identifying fraud and addressing any risk of management override. The Audit Committee also receives management reports regarding specific areas of financial risk and discusses strategies to mitigate risk.

100. The 2021 proxy statement represented that the Safety and Compliance Oversight

Committee "assists the Board with overseeing the Company's activities with respect to safety and

operational compliance," adding:

> Pursuant to its Charter, the Safety and Compliance Oversight Committee is responsible for monitoring the Company's activities in areas of safety and operational compliance taking into account applicable government and industry standards, materiality, legal and business trends, and public policy issues, as well as periodically assessing the Company's safety and operational compliance obligations and associated risks and performance relative to those standards. In fulfilling this responsibility, the Safety and Compliance Oversight Committee regularly reviews with management input and information from reports received from regulators and other parties related to the Company's safety and operational compliance activities, specifies areas to be addressed at its meetings, and requires that individuals from a variety of operational areas and levels be available to discuss their areas of responsibility and respond to questions.

101. On the basis of the false and misleading representations and omissions in the 2021

Proxy Statement, Southwest solicited shareholders to approve executive compensation and to elect

Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Kelly, Lieblein, Loeffler,

Montford, and Ricks to the Company's Board. The solicitations were successful.

102.    In the Company's 2022 proxy statement, filed on April 8, 2022, Southwest stated: "The Board is responsible for overseeing management's assessments of major risks facing the Company and for reviewing options to mitigate such risks. The Board's oversight of major risks occurs at both the full Board level and at the Board committee level." Of the full Board, the proxy statement continued:

> The Chief Executive Officer, the President and Chief Operating Officer, the Chief Financial Officer, members of senior management, and other personnel and advisors, as requested by the Board, report on the Company's financial, operating, and commercial strategies, as well as any related risks, at every regularly scheduled meeting of the Board. Based on these reports, the Board requests follow-up data and presentations to address any specific concerns and recommendations.

103.    The 2022 proxy statement represented that the Audit Committee "assists the Board with its oversight responsibilities by discussing the Company's major financial risk exposures, its guidelines and policies with respect to risk assessment and risk management, and the steps management has taken to monitor and control or mitigate financial risk exposures." Of the Audit Committee's specific duties, the proxy statement continued:

> The Audit Committee discusses with the Company's management, as well as the Company's Internal Audit Department (including in executive sessions), the Company's guidelines and policies with respect to risk assessment and risk management and advises management on its risk assessment approach and its prioritization of risks. The Audit Committee also receives regular reports on, and assessments of, the Company's internal controls from the Company's Internal Audit Department and members of management responsible for financial controls. In addition, the Audit Committee receives the independent auditor's assessment of the Company's internal controls and financial risks, which includes the independent auditor's report on its procedures for identifying fraud and addressing any risk of management override. The Audit Committee also receives management reports regarding specific areas of financial risk and discusses strategies to mitigate risk.

104.    The 2022 proxy statement represented that the Safety and Compliance Oversight Committee "assists the Board with overseeing the Company's activities with respect to safety and operational compliance," adding:

Pursuant to its Charter, the Safety and Compliance Oversight Committee is responsible for monitoring the Company's activities in areas of safety and operational compliance taking into account applicable government and industry standards, materiality, legal and business trends, and public policy issues, as well as periodically assessing the Company's safety and operational compliance obligations and associated risks and performance relative to those standards. In fulfilling this responsibility, the Safety and Compliance Oversight Committee regularly reviews with management input and information from reports received from regulators and other parties related to the Company's safety and operational compliance activities, specifies areas to be addressed at its meetings, and requires that individuals from a variety of operational areas and levels be available to discuss their areas of responsibility and respond to questions.

105.    On the basis of the false and misleading representations and omissions in the 2022 Proxy Statement, Southwest solicited shareholders to approve executive compensation and to elect Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Loeffler, Montford, Reynolds, and Ricks to the Company's Board. The solicitations were successful.

## DAMAGE TO THE COMPANY

106.    The Individual Defendants have damaged the Company. Damages to the Company include substantial loss of shareholder value and significant monetary costs already incurred and to be incurred stemming from the events and allegations described herein.

107.    Because of the Individual Defendants' misconduct, Southwest had to issue more than $600 million dollars in refunds to impacted travelers as well as additional hundreds of millions in the form of lost ticket sales, lost baggage claims, and hotel, meal, and alternate travel reimbursements.

108.    As discussed herein, Southwest also paid a record $140 million penalty to the DOT and is subject to the Consent Order, which requires the Company to cease and desist from further violations of 49 U.S.C. § 41712, 14 CFR § 259.5, and 14 CFR § 259.8 as well as establishing and administering an enhanced passenger compensation system requiring the payment of vouchers to

passengers under certain conditions from April 30, 2024 through April 29, 2027, collectively valued at $90 million.

109.    The Individual Defendants' misconduct has also greatly harmed Southwest's overall business. Southwest disclosed in its 2022 Form 10-K, filed on February 7, 2023, that the December 2022 holiday travel incident would cost the Company approximately $800 million and lead to a net loss of $220 million for the fourth quarter:

> The Company estimates the financial impact of this disruption was approximately $800 million on a pre-tax basis, and resulted in the Company reporting a net loss of $220 million for fourth quarter 2022. A significant portion of this impact was due to the loss of Operating revenue associated with the flight cancellations that is estimated to be approximately $410 million. The remaining impact primarily related to a net increase of approximately $390 million in operating expenses, primarily due to travel expense reimbursements to Customers, the estimated value of Rapid Rewards points offered as a gesture of goodwill to Customers that are expected to be redeemed, and premium pay and additional compensation for Employees, which were partially offset by lower fuel and oil and profitsharing expenses.

110.    For the first quarter of 2023, the Company disclosed in a Form 10-Q filed on April 28, 2023 that it was continuing to accrue costs and losses from the incident—and also that customers were booking fewer flights with Southwest, indicating severe reputational damage:

> For first quarter 2023, these events also created a deceleration in bookings, primarily isolated to January and February 2023, as well as increased expenses of approximately $55 million, which are included in the accompanying unaudited Condensed Consolidated Statement of Comprehensive Income (Loss) for the three months ended March 31, 2023. These expenses included reimbursements to Customers impacted by the cancellations for costs they incurred in excess of the amounts accrued as of December 31, 2022, adjustments to the estimated value of Rapid Rewards points offered as a gesture of goodwill to Customers as a result of changes in the estimates of the points expected to be redeemed, and additional premium pay and additional compensation for Employees directly or indirectly impacted by the cancellations and recovery efforts. The financial impacts of the event to the Company also included the elimination of profitsharing expenses for the quarter. The continuing effects of this event significantly contributed to the Company recording a net loss for first quarter 2023 in the amount of $159 million.

111.    In a press release accompanying the first quarter 10-Q, Defendant Jordan was quoted as saying:

> As expected, we incurred a first quarter 2023 net loss that resulted from the negative financial impact of approximately $380 million pre-tax, or $294 million after-tax, related to the December 2022 operational disruption. The majority of this impact was driven by a negative revenue impact of approximately $325 million, as a result of cancellations of holiday return travel and a deceleration in bookings for January and February 2023 travel. Despite that, travel demand and revenue trends in March 2023 were strong and resulted in solid profitability for the month and record first quarter revenues.

112.    Because of the Individual Defendants' misconduct, the Company and the Contribution Defendants have also been named as defendants in the Securities Action. Southwest has been damaged by the Individual Defendants' misconduct in exposing the Company to millions of dollars in costs and potential liability in that action.

113.     Southwest's reputation is now in serious doubt and has been greatly damaged by the Individual Defendants' misconduct described herein.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

114.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

115.    Plaintiff brings this action derivatively on behalf of Southwest to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duties by the Individual Defendants alleged herein. Southwest is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it otherwise would not have.

116.    Plaintiff is a current Southwest shareholder and has been a Southwest shareholder continuously at all times relevant to the breaches complained of herein. Plaintiff has retained

counsel experienced in shareholder litigation and will adequately and fairly represent the interests of the Company in enforcing its rights.

117.    On December 8, 2023, Plaintiff made the Litigation Demand on the Board to investigate and pursue breach of fiduciary duty and other claims against those responsible for the conduct described herein as required by Tex. Bus. Orgs. Code § 21.553. The Litigation Demand was emailed to counsel for the Board and delivered to the Company on December 11, 2023. The Board has totally ignored Plaintiff's Litigation Demand. Having not received any response from the Board, Plaintiff now considers her Litigation Demand to have been constructively refused.

118.    The Board has acted in bad faith by ignoring Plaintiff's Litigation Demand and failing to timely investigate and pursue claims relating to the Individual Defendants' actions in accordance with their duties under Texas law. Though the Company purports in its public filings to have established a Special Litigation Committee relating to the allegations described herein, Plaintiff has received no information from the Board concerning its activities or indeed even the committee's composition such that Plaintiff might assess its independence and potential conflicts of interest. In its public filings, including in the Company's recent Form 10-Q filed on April 26, 2024, Southwest indicated that it is using the purported investigation of the Special Litigation Committee as a justification to stay the proceedings of earlier-filed derivative complaints.

119.    As of the filing of this Complaint, having summarily ignored Plaintiff's Litigation Demand, Southwest has not commenced any action against any of the Individual Defendants, and its establishment of the Special Litigation Committee appears to be little more than a bad faith delay tactic intended to indefinitely push off Company shareholders with valid claims, like Plaintiff.

120.    The Board cannot use the pretext of pending lawsuits or the establishment of a special litigation committee as blanket justifications for inaction. Accordingly, the Board's and the Special Litigation Committee's refusal to consider Plaintiff's Litigation Demand in a timely and appropriate manner constitutes its wrongful refusal.

**COUNT I**
**Breach of Fiduciary Duty**
**Against the Individual Defendants**

121.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

122.    As Company directors and officers, the Individual Defendants owed and owe the Company fiduciary duties of care, loyalty, obedience, and good faith under Texas law.

123.    By virtue of their positions as Company officers and directors, the Individual Defendants at all relevant times had the power to and did control, influence, and cause the Company to engage in the practices complained of herein.

124.    The Individual Defendants, and each of them, knowingly or recklessly ignored their obligations under federal law, the Company's internal controls, and numerous warnings and previous incidents specifically relating to significant operational problems stemming from the Company's outdated flight- and crew-management software systems. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

125.    The Individual Defendants, and each of them, knowingly or recklessly violated their fiduciary duties by repeatedly failing to ensure the Company maintained effective controls relating to its outdated flight- and crew-management software systems.

126.    The Individual Defendants ignored and/or failed to act on numerous red flags and failed to ensure that the Company complied with federal laws and regulations governing air carriers, including 49 U.S.C. § 41712, 14 CFR § 259.5, and 14 CFR § 259.8.

127.    Despite overseeing such a heavily-regulated company, the Individual Defendants, and especially the Director Defendants, willfully blinded themselves to known, material risks.

128.    The Individual Defendants acted in bad faith and violated their fiduciary duties of care and loyalty owed to the Company.

129.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, the Company has sustained significant damages.

130.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

<u>**COUNT II**</u>
**Violations of Section 14(a) of the Exchange Act**
**Against the Director Defendants**

131.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein, except to the extent that those allegations plead knowing or reckless conduct by the Director Defendants. This claim is based solely on negligence and, for purposes of this claim, Plaintiff disclaims any allegations of fraud, scienter, or recklessness.

132.    By their acts and omissions alleged herein, the Director Defendants (Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Lieblein, Loeffler, Montford, Reynolds, and Ricks) violated Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and SEC Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

133.    The Director Defendants negligently issued, caused to be issued, and/or participated in the issuance of materially false and misleading written statements to shareholders

contained in the 2020, 2021, and 2022 Proxy Statements filed with the SEC on April 9, 2020, April 9, 2021, and April 8, 2022, respectively, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

134.    The 2020 Proxy Statement solicited the Company's shareholders to elect Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Kelly, Lieblein, Loeffler, Montford, and Ricks to the Company's Board. The 2021 Proxy Statement solicited the Company's shareholders to elect Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Kelly, Lieblein, Loeffler, Montford, and Ricks to the Company's Board. The 2022 Proxy Statement solicited the Company's shareholders to elect Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Loeffler, Montford, Reynolds, and Ricks to the Company's Board. All of the Board's solicitations were successful.

135.    The 2020, 2021, and 2022 Proxy Statements also solicited the Company's shareholders to approve executive compensation, which solicitations were successful. The 2020 Proxy Statement also urged the Company's shareholders to vote against a shareholder proposal to require an independent Board chairperson, which proposal was rejected.

136.    The 2020, 2021, and 2022 Proxy Statements misstated or omitted material information concerning: (1) the Company's inadequate internal controls; (2) the Board's ineffective oversight of the Company's compliance programs to ensure critical flight- and crew-management systems could withstand disturbances; and (3) the Company's compliance with applicable laws and regulations.

137.    As a direct and proximate result of the Director Defendants' wrongful conduct, the Company misled its shareholders by making false and misleading statements and omitting material information that was essential to assessing the Company's recommendation to re-elect the Director

Defendants, approve certain executive compensation, and vote against a shareholder proposal to require an independent Board chairperson.

138.    Absent these false or misleading statements and omissions in the Proxy Statements, Company shareholders would not have voted to re-elect the Director Defendants, approve certain executive compensation, and reject a proposal to require an independent Board chairperson.

139.    Plaintiff, on behalf of the Company, seeks damages inflicted on the Company caused by the misleading 2020, 2021, and 2022 Proxy Statements in connection with the improper re-election of the members of the Board, approval of executive compensation, and rejection of a shareholder proposal to require an independent Board chairperson.

**COUNT III**
**For Contribution Under 15 U.S.C. § 78u-4(f)**
**Against the Contribution Defendants**

140.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

141.    The Company and the Contribution Defendants (Defendants Jordan, Kelly, Nealon, Romo, Van de Ven, and Watterson) are named as defendants in the Securities Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.

142.    The Securities Action has caused and will continue to cause the Company to incur substantial costs for defense and settlement. If the Company is found liable in the Securities Action, that liability will be due in whole or part to the Contribution Defendants' willful and/or reckless violations of their obligations as Company officers and/or directors.

143.    The Contribution Defendants, because of their positions of control and authority as Company officers and/or directors, were able to and did, directly and/or indirectly, exercise control

over the Company's business and corporate affairs, including the wrongful acts alleged herein and in the Securities Action.

144.     Accordingly, the Contribution Defendants are liable under Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)(5)(A)-(D) and § 78u-4(f)(8)), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

145.     The Company is entitled to receive all appropriate contribution or indemnification from the Contribution Defendants.

## COUNT IV
### Unjust Enrichment
### Against the Individual Defendants

146.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

147.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of the Company.

148.     The Individual Defendants were unjustly enriched as a result of the compensation, including bonuses, stock options, or other compensation, they received while breaching their fiduciary duties owed to the Company.

149.     Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all their profits, benefits, and other compensation obtained by reason of the wrongful conduct and breaches of fiduciary duty alleged herein.

150.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT V
### Waste of Corporate Assets
### Against the Individual Defendants

151.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

152.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (i) paying excessive compensation and bonuses in light of the Individual Defendants' bad faith conduct and breaches of fiduciary duties alleged herein and (ii) subjecting the Company to millions of dollars of legal costs and actual and potential liability, including, among other things, costs and liability associated with the Securities Action and the record-breaking DOT penalty and Consent Decree.

153.    As a result of the waste of corporate assets alleged herein, the Individual Defendants are liable to the Company.

154.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment on behalf of Southwest as follows:

A.    Determining that this action is a proper derivative action and that Plaintiff is an adequate representative of the Company and may maintain this action on its behalf;

B.    Determining that a litigation demand on the Board would have been futile;

C.    Declaring that the Individual Defendants breached their fiduciary duties to the Company and were unjustly enriched as set forth above;

D.    Determining and awarding to the Company the damages sustained by it as a result of the breaches set forth above, or disgorgement or restitution, from each of the Individual Defendants, jointly and severally, together with interest thereon;

E.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect the Company and its shareholders from repeating the harms described herein;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable fees and costs to Plaintiff's attorneys and experts; and

G.      Granting such further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 26, 2024

/s/ *Daniel H. Charest*
Daniel H. Charest, State Bar No. 24057803
Hannah M. Crowe, State Bar No. 24131156
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
dcharest@burnscharest.com
hcrowe@burnscharest.com

**SCHUBERT JONCKHEER & KOLBE LLP**
Robert C. Schubert (*Pro Hac Vice* Forthcoming)
Willem F. Jonckheer (*Pro Hac Vice* Forthcoming)
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
rschubert@sjk.law
wjonckheer@sjk.law

**SHAPIRO HABER & URMY LLP**
Edward F. Haber (*Pro Hac Vice* Forthcoming)
One Boston Place, Suite 2600
Boston, MA 02108
Tel: (617) 439-3939
ehaber@shulaw.com

*Counsel for Plaintiff*

44

DocuSign Envelope ID: 69487E49-E135-4881-AF22-A4C88213D439

## **VERIFICATION**

I, Donna Hickok, am the plaintiff in this action. I hereby verify that I have reviewed the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations and facts of which I have personal knowledge, those allegations and facts are true and correct to the best of my knowledge, information, and belief. As to those allegations and facts of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.


Date: _June 24, 2024_____     _____

                                                          Donna Hickok

1